# LIZA, c. w. v. DR. PUISSANT et al.

The temporary residence of a slave, even with the consent of the master, in a foreign coun-
try, does not entitle the slave to freedom after his voluntary return with the master to a
State where slavery exists.

APPEAL from the First District Court of New Orleans, *Larue*, J. J.
C. David, for plaintiff. *Janin* and *Taylor*, for defendants. The judg-
ment of the court was pronounced by

ROST, J. The plaintiff was born the slave of the late *Hardy De Boisblanc*.
In 1821, *Boisblanc* went to Bordeaux, where his family were then sojourning, for
the purpose of bringing them back to Louisiana. He took with him to Europe,
for their education, *Mrs. Puissant* and her sister, *Mrs. Sauvé*, who were under
ten years of age, and the plaintiff, then twelve years old, went with them
as a servant. *Mr. Boisblanc* remained two or three months in Bordeaux, and
then sailed for Louisiana with his family and the plaintiff, who remained with
him as a slave. She was given to the defendant, *Mrs. Puissant*, at the time of
her marriage, about twenty years ago, and has continued in her service ever
since. She has had seven children since her return from Europe. She alleges,
that she became free by putting her foot upon French soil, and claims her
freedom and that of her children, together with damages, since the defendat
was apprised of her rights. There was judgment against her, and she appealed.

This case is similar to that of *Bernard Conant, Tutor,* v. *Guesnard and Wife*,
5th Ann. 696. The only difference between the two being. that the plaintiff
was taken to France before the passage of the act of 1846. Had there been no
such statute, the opinion clearly intimates, that the decision would have been
the same, on the ground, that the owner of the slave never intended that she
should reside in France, but took her merely as a servant during the voyage,
with the intention to send her back to Louisiana, which intention she carried

LIZA
*v.*
PUISSANT.

out within a reasonable time. That case, as well as the present, came fairly within the exception in the case of *Arsene* v. *Pignéguy*, 2d Ann. 621.

The district judge, in his opinion, comments as follows upon the evidence in the record: " *Boisblanc* did not go to France to establish a domicil. He did not go there to reside any length of time. He went for a specific purpose, to bring back his wife to Louisiana, and appears to have remained at Bordeaux for as short a time as the nature of the intercourse between that city and this, thirty years ago, would permit. The circumstances of the case would rather seem to bring it within the rule applicable to those who are passing through a foreign country on a lawful journey." See the case of *Arsene* v. *Pignéguy.*

We concur fully in these views, and are satisfied, that even if *Arsene's* case was taken as the rule of our decision, we could not interfere with the judgment. Whether we would follow that precedent in all cases which occurred before the passage of the act of 1846, it is unnecessary to say. The principle, that the temporary residence of a slave in a country in which slavery is not tolerated, does not, of itself, work such a permanent change in his *status* as to make him free after his voluntary return to the domicil of his master, by the laws of which slavery exist, is supported by high authority. Case of slave *Grace,* 2d Haggard's Admiralty R. 94 *Commonwealth of Mass.* v. *Aves,* 18 Pickering, 193. Story Conflict of Laws, No. 96. *Strader et al.* v. *Graham,* 10 Howard, 82.

The judgment is affirmed, with costs.

EUSTIS, C. J. The petition bases the right of freedom asserted, on the fact of the petitioner having been in France in the year 1821 ; it charges, that by putting her foot on the soil of France, she immediately became free. It is proved, in this case, that it was never the intention of the family that *Liza* should be left in France, but she was to return immediately to Louisiana ; which she did with *Mr. Boisblanc* and his family. I concur with the district judge, in considering the slave as accompanying persons in their service on a lawful journey. There was an evident propriety, little short of necessity, in the children being accompanied by a female servant on board the ship, in the absence of a female relative, and it is not alleged or proved, that there was any delay in returning the slave to her home, according to the original purpose, when her services were no longer needed. So that the question of law involved in the case may be considered as well stated in the petition. There is a case in which an opinion was expressed, that the presence of a female slave in France, with the consent of the master, creates, *per se*, the condition of freedom, so that her return to Louisiana does not subject her to servitude ; I feel it to be my duty to state my reasons for dissenting from the opinion expressed in that case. It is the case of *Marie Louise* v. *Marot,* 9th L. R. 475, decided in May, 1836. The court there say, the plaintiff being free for one moment in France, it was not in the power of her former owner to reduce her again to slavery. That this is true, in France, there can be no question ; the law of France recognizes no such relation as that of master and slave. But I do not concur in the opinion, that on the voluntary return of the slave to the country of his domicil, from one in which slavery does not exist, the dominion of the master can in no case be exercised. There is another case, *Smith* v. *Smith,* 13 L. R. 445, in which the principle decided in the previous case is affirmed, although the facts of the case presented other grounds on which the decision could be made. I concurred in the judgment in that case, and I think the case was well decided for the plaintiff; but I am satisfied, that it was an

11

LIZA
*v.*
PUISSANT.

error to place it on the reasons given in the opinion of the court by Judge Martin. *Mrs. Smith*, the mistress, had left Louisiana for France. She took with her the female slave, who was the plaintiff. She had remained in France, and there was no intention on her part to return to Louisiana. Her residence was there, and she endeavored to retain the plaintiff with her in France. The absence of the defendant, from its origin, had a character of permanency, and the plaintiff's removal from Louisiana, so far as the intentions of the defendant could be reached in the evidence, was with the same purpose. The case of *Thomas*, f. m. c. v. *Generes*, 16 L. R. 483, is, as to the facts, like that just cited.

In all the cases of this kind which have been decided in this court, we have avoided anything which could be considered as an affirmance of the principle laid down in the case of *Marot*. The first case that came before us, was that of *Josephine* v. *Poultney*, 1st Ann. 328. In that case, the defendant had removed from Louisiana to Philadelphia with her slave, who was the plaintiff, and had resided for years there, and by virtue of this residence, we held her released from the dominion of her mistress, which did not revert on the removal of both to this State. The decision was based on the effect of the acquired residence in Philadelphia, on the condition of the plaintiff.

In the case of *Eugenie* v. *Préval*, 2d Ann. 180, the plaintiff had been taken to France by his daughter, who was married to a French officer, in whose service she remained for years. We said, "this case is nearly the same with that decided in June last, of *Josephine* v. *Poultney*, in which we held, that the *status* of freedom was acquired, not by having been in a country in which slavery did not exist, but by a residence and domicil there." In the case of *Arsene* v. *Pignéguy*, 2d Ann. 621, the plaintiff had been taken to France, and remained there in the service of the family of her master, for the space of two years. We considered the condition of the plaintiff as changed by her remaining in France for such a length of time. In that case, we distinctly stated what we considered as exceptions to the rule in *Marot's* case, which we thought was too general in its terms. We stated, as exceptions, the cases of persons thrown on foreign coasts by shipwreck, taking refuge from pirates, driven by some overwhelming necessity, or perhaps those passing through a foreign territory, on a lawful journey.

By the statute of 1846, no slave can be entitled to his freedom in this State, by having been with or without the consent of his master, in a country where slavery does not exist. No questions of this kind can occur in relation to any rights asserted by slaves subsequent to this statute, which are covered by its operation. The jurisprudence, independent of that statute, has been far from being settled on principles on which questions of this gravity ought to have rested. The opinion in *Marot's* case, seems to have been adopted from precedents, and there does not appear to have been any consideration of those exceptions which must obviously exist to the rule. For instance, the case of the fugitive slave. So far as the rights of his master are concerned, they are equally protected, wherever the fugitive may be. Our courts must hold, that the possession of the master continues, notwithstanding the flight of the slave. *Oates* v. *Caffin*, 3d Ann. 341. Pothier, Treaties on Possession, sec. 89.

This is not the only rule relating to the conflict of laws which presents, in its practical results, more exceptions than examples under it; and which, consequently, affords a most unsafe guide in the administration of justice. Has it

ever been supposed, that a father in Spain, where the age of majority is twenty-five, loses the paternal power over his son over the age of twenty-one, by the latter's temporarily sojourning in England or crossing the frontier of France, where the age of majority is twenty-one? And that on his return to his country, being still of the age of minority, the minor is emancipated, and can no longer be held subject to the paternal authority? And that this change in his condition is wrought by his accidental presence in a land, where, by its laws, he would be held to be *sui juris?* A distinction is made between slavery and other domestic relations, because it is said that slavery is contrary to the law of nature and the creature of municipal law. But what law of nature fixes the age of majority at twenty-one or twenty-five? Rutherford's Institutes, lib. 1, c. 11, sec. 8. *Jus autem potestatis, quod in liberos habemus, proprium est civium Romanorum: nulli enim alii sunt homines, qui talem in liberos habeant potestatem, qualem nos habemus.* Inst., lib. 1, tit. 9, s. 2. The sacred relation of marriage itself is an institution of municipal law, recognized as is that of slavery, by the law of nations. *Justas autem nuptias inter se contrahunt cives Romani qui secundum præcepta legum cöeunt.* Inst. lib. 1, tit. 10. So far as foreign laws have effect upon the *status* of persons, their domestic relations must, necessarily, all be upon the same footing.

The authorities cited in the opinion of Judge Rost, are in direct opposition to the decision in *Marot's* case. The case of *Strader* v. *Graham*, 10 Howard, 82, was an appeal taken by writ of error from the Court of Appeals of Kentucky. It was not decided on its merits in the Supreme Court of the United States, but went off on a question of jurisdiction. In that case, certain slaves, who were musicians, had gone from Kentucky across the river to Ohio, on more than one occasion, with the permission of their master, to perform at public entertainments. The courts of Kentucky held, that they did not acquire their freedom by this temporary presence in a State where slavery was prohibited. This is the only practical doctrine which can be maintained in a State whose frontier, for hundreds of miles, is bounded by free States, where the communication is open, and the intercourse between the inhabitants constant and uninterrupted. It rests with each State to establish and regulate the domestic relations of its inhabitants. A State may prohibit slavery within its limits, may abolish the paternal power; but this imposes no obligation on other States to hold the condition of persons domiciled there, as extinguished by reason of a presence in the State in which the relation is not recognized. This court has held the *status* of a slave to be changed by a residence in a country in which slavery did not exist, when the residence, with the consent of the master, had a character of permanency, but not that the *status* was affected by a transit for a temporary purpose. Cases of this kind, resting mainly on the intention of parties, are attended with great difficulties in their solution; but in this respect, they resemble all cases of contested or questionable domicil.

For these reasons, I think the judgment of the district court ought to be affirmed.